IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| MELISSA HILL, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>vs.<br><br>LLR, INC. d/b/a LuLaRoe, and LULAROE, INC.<br><br>     Defendants. | CV-18-120-GF-BMM-JCL<br><br><br>FINDINGS & RECOMMENDATION |

Plaintiff Melissa Hill brings this putative class action against Defendants LLR, Inc. and LuLaRoe, LLC ("LLR") asserting state law claims arising from sales tax overcharges on clothing purchases by Montana consumers. LLR moves to dismiss under Federal Rule of Civil Procedure 12(b) for lack of subject matter jurisdiction based on lack of standing and failure to state a claim upon which relief may be granted. LLR also moves to strike the class allegations on the ground that Hill cannot satisfy the superiority requirements of Rule 23. For the reasons set forth below, LLR's motion should be denied.

I. <u>**Background**</u>

LLR is a direct sales company that sells clothing at wholesale prices to Independent Fashion Retailers ("Retailers") located in all fifty states. The

1

Retailers, in turn, resell this merchandise at retail to third-party customers. LLR collects sales taxes on behalf of its Retailers and remits the amounts collected to the various state and local sales tax jurisdictions for which the sales tax was collected.

In 2014, LLR engaged a software developer to create a customized point-of-sale system ("Audrey") so that sales taxes could be assessed based on a Retailer's location or where the merchandise was shipped. When Audrey was first introduced, it included a toggle-switch allowing Retailers to turn off sales tax charges on sales made into tax-free jurisdictions.

In early 2016, LLR learned that despite the toggle-switch, Audrey's programming was causing LLR to pay sales tax on all sales, including those for which Audrey did not tax the end consumer because the merchandise was delivered to a tax-free jurisdiction. As a result, LLR was paying more sales tax to the various tax jurisdictions than it was collecting.

To address its overpayment of sales tax, LLR instituted an interim sales tax policy in April 2016 (the "2016 Tax Policy"), whereby Audrey would collect sales tax from end consumers on every transaction based on retailer location, regardless of where the merchandise was delivered. In effect, LLR's Retailers were to over collect sales tax on certain transactions -- such as interstate transactions delivered

2

into a non-sales tax state from a sales tax state. In a memorandum circulated to all

Retailers, LLR explained that it would soon be transitioning to a permanent sales

tax policy pursuant to which sales tax would be assessed based on the point of sale

or the end consumer's shipping address. As it turned out, however, Audrey could

not be reprogrammed to perform the functions needed to make this transition and

accurately calculate the required sales tax. Thus, in January 2017, LLR launched a

new point-of-sale system ("Bless") which accurately calculated sales tax on all

transactions. LLR completed the transition to Bless on May 31, 2017, at which

time Audrey was permanently disabled.

Beginning in June 2016, LLR implemented a refund program, during which

it identified more than 2.5 million transactions involving merchandise delivered to

non-taxing jurisdictions since Audrey's implementation and issued sales tax

refunds to affected customers. (Doc. 21). These included 52,379 transactions

shipped into Montana for which an incorrect sales tax was charged to end

consumers, including Hill. LLR has issued sales tax refunds in the amount of

$188,697 for these Montana transactions (Doc. 37, at 7).

In February 2017, counsel initiated a lawsuit against LLR in the Western

District of Pennsylvania alleging claims on behalf of consumers in Montana and

ten other states who were incorrectly charged sales tax on clothing purchases

processed through Audrey. *Webster v. LLR, Inc.*, 2:17-cv-00225-DSC. In December 2017, counsel in the *Webster* action filed a motion for class certification on behalf of plaintiffs representing subclasses for those eleven states, including Hill as the representative for the Montana subclass. Citing the variations in state law, the *Webster* court denied the motion because the plaintiffs were "unable to establish Rule 23,'s requirements relating to commonality, the adequacy of class representation, predominance and superiority." (Doc. 22-1, at 13). On September 19, 2018, the Pennsylvania court dismissed *Webster* for lack of subject matter jurisdiction. (Doc. 22-4).

Approximately one week before *Webster* was dismissed, Hill filed her complaint in this case alleging diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). (Doc. 1). Hill resides in Great Falls, Montana, which is a sales tax-free jurisdiction. According to LLR's records, between November 2016 and April 2017, Hill made purchases from LLR totaling approximately $4,500 that were delivered to her in Montana. (Doc. 21, at 11). LLR determined that Hill was incorrectly charged sales tax through Audrey on some of these transactions, and by the end of April 2017 had issued her refunds totaling $291.70. (Doc. 21, at 11).

Notwithstanding these refunds, Hill claims she was harmed because LLR

wrongfully collected nearly $300 in sales tax from her and held on to that money, or portions of it, for more than four months. Hill asserts putative class claims against LLR for violations of the Montana Consumer Protection Act ("MCPA"), conversion and misappropriation, and deceit. She seeks damages for the lost time value of the nearly $300 in sales tax LLR collected from her, along with statutory and punitive damages, and injunctive relief.

LLR has moved under Federal Rule of Civil Procedure 12(b) to dismiss the Complaint in its entirety for lack of subject matter jurisdiction based on lack of standing, and failure to state a claim upon which relief may be granted. LLR also moves to strike the class allegations on the ground that Hill cannot satisfy the superiority requirements of Rule 23.

## II.   Legal Standard

### A.   Rule 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject matter jurisdiction over the claims asserted. "Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence." *Rattlesnake Coalition v. United States Environmental Protection Agency*, 509 F.3d 1095, 1102 n. 1 (9th Cir. 2007).

A defendant may pursue a Rule 12(b)(1) motion to dismiss for lack of jurisdiction either as a facial challenge to the allegations of a pleading, or as a substantive challenge to the facts underlying the allegations. *Savage v. Glendale Union High School, Dist. No. 205, Maricopa County*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). A facial challenge to the jurisdictional allegations is one which contends that the allegations "are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial challenge the court must assume the allegations in the complaint are true and it must "draw all reasonable inferences in [plaintiff's] favor." *Wolfe*, 392 F.3d at 362. "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039. In resolving such a factual attack, the court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Safe Air for Everyone*, 373 F.3d at 1039.

LuLaRoe's motion to dismiss for lack of standing constitutes a factual challenge to the subject matter jurisdiction of this Court. To determine whether Hill has standing, the Court properly looks outside the pleadings to the other materials of record.

### B.      Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.*" Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint will survive a motion to dismiss if it alleges facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. If the complaint "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory," however, then dismissal under Rule 12(b)(6) is appropriate. *Mendiondo*, 521 F.3d at 1104. In determining whether this standard is satisfied, the court must accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiffs. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

7

III.   <u>**Motion to Dismiss for Lack of Subject Matter Jurisdiction**</u>

LLR argues this action should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction because Hill lacks standing under both Article III of the United States Constitution and Montana law.

As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing standing to sue. *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996). Where, as here, jurisdiction is based "on diversity of citizenship, the plaintiff must have standing under both Article III of the Constitution and applicable state law in order to maintain a cause of action." *City of Spokane v. Monsanto Company*, 2016 WL 6275164, at *4 (E.D. Wash. Oct. 26, 2016) (quoting *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 173 (2d. Cir. 2005)).

The plaintiff must establish standing under Article III of the Constitution "for each of her claims and for each form of relief sought." *In re Adobe Systems, Inc. Privacy Litigation*, 66 F.Supp.3d 1197, 1218 (N.D. Cal. 2014) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). Article III standing requires proof "(1) that the plaintiff suffered an injury in fact that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical;' (2) of a causal connection between the injury and the complained-of conduct; and (3) that a

8

favorable decision will likely redress the alleged injury." *Alaska Right to Life Political Action Committee v. Feldman*, 504 F.3d 840, 848 (9th Cir. 2007) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

In addition to establishing Article III standing, the plaintiff in a diversity case must satisfy state law standing requirements. Relevant here, the MCPA authorizes "a private cause of action for actual and treble damages upon proof that a consumer suffered '[any] ascertainable loss of money or property' caused by the 'use or employment' of 'unfair or deceptive acts or practices in the conduct of any trade or commerce.'" *Anderson v. ReconTrust Co., N.A.*, 407 P.3d 692, 700 (Mont. 2017) (quoting Mont. Code Ann. §§ 30-14-103, -133(1)). Thus, to have standing under the MCPA, a plaintiff must show that she has suffered an "ascertainable loss of money or property." Mont. Code Ann. § 30-14-133(1).

LLR argues that because Hill received a full refund of all overcharged sales tax, she cannot demonstrate any injury in fact or ascertainable loss as required to establish standing under Article III and the MCPA, respectively. LLR has provided a declaration from Senior Tax Analyst Jamie Ellis, who states that he personally reviewed the transactions recorded in Audrey for Hill and determined that between November 2016 and April 2017, she "made purchases totaling approximately $4,500 (before sales tax was added) that were delivered into a non-taxing

jurisdiction." (Doc. 21, ¶ 26). Ellis explains that Hill "was charged sales tax through Audrey on some of these transactions, but not all." (Doc. 21, ¶ 26). As part of its sales tax refund program, LLR issued Hill refunds totaling $291.70 between March 14, 2017 and April 23, 2017. (Doc. 21, ¶ 28). Ellis reviewed the transactions for which Hill was charged sales tax, and confirmed that she was refunded the full amount of sales tax that was collected from her. (Doc.21, ¶ 26). Because Hill received a full refund more than a year before she filed this lawsuit in September 2018, LLR maintains she has not suffered an injury in fact or ascertainable loss as required to establish standing.

Hill explains in response that she did not keep many of her LLR receipts, which means she cannot independently determine the exact amount that she was overcharged and whether she received a full refund. (Doc. 38, at 3). Thus, for purposes of responding to LLR's motion, Hill does not dispute that LLR provided her with a full refund of overcharged sales tax in the amount of $291.70. But even assuming she received a full refund of the overcharged sales tax, Hill argues that the lost time value of her money and LLR's failure to pay her interest are sufficient to satisfy the injury in fact requirement for Article III standing, as well as the ascertainable loss requirement for standing under the MCPA.

While standing under Article III and applicable state law must be considered

separately, whether Montana recognizes the lost time value of money as an ascertainable loss is relevant for purposes of determining whether Hill has suffered an injury in fact under Article III. (Doc. 48, at 19). See generally, *Weidenhamer v. Expedia*, 2015 WL 1292978, at **3-4 (W.D. Wash. March 23, 2015); *Hamilton v. General Mills, Inc.*, 2016 WL 406310 (D. Or. July 27, 2016). Thus, the Court begins by considering whether Hill has sufficiently demonstrated an ascertainable loss as required for standing under the MCPA.

### A.   Standing under the MCPA

The Montana Supreme Court has not specifically considered whether the lost time value of money constitutes an ascertainable loss under the MCPA. Where, as here, "the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it." *Ticknor v. Choice Hotels Interns., Inc.*, 256 F.3d 931, 939 (9th Cir. 2001).

For the reasons set forth below, the Court concludes that the lost time value of money constitutes an ascertainable loss under the MCPA. First, the Montana Supreme Court construes the MCPA's damage provisions broadly and in favor of consumers in order to carry out the statute's inherent remedial purpose. See *Puryer v. HSBC Bank USA, N.A.,* 419 P.3d 105, 115 (Mont. 2018); *Jacobson v. Bayview Loan Servicing, LLC*, 371 P.3d 397, 413 (Mont. 2016). As reflected by the MCPA,

Montana places the public's protection from unfair or deceptive business practices at a "high legislative priority." *Tripp v. Jeld-Wen, Inc.*, 112 P.3d 1018, 1026 (Mont. 2005). "Part of the inherent 'remedial purpose' of the damage provisions of the MCPA is to deter inappropriate action against consumers" and provide "notice to all that violations of the MCPA are consequential and will not be tolerated." *Jacobson*, 371 P.3d at 413.

Consistent with this remedial purpose, the Montana Supreme Court defines "ascertainable loss" broadly. See *Puryer v. HSBC Bank USA, N.A.,* 419 P.3d 105, 115 (Mont. 2018). The Court has rejected the argument that "ascertainable loss of money and property" requires a showing of "actual damages," such as foreclosure sale. *Puryer*, 419 P.3d at 115 (citing *Jacobson*, 371 P.3d at 411). Instead, the Court has concluded that damages such as lost opportunities to save a home, negative credit impact, and not having received a loan modification are sufficient to establish a pecuniary "ascertainable loss" under the MCPA. Because the Montana Supreme Court has consistently construed the MCPA's damage provisions broadly so as to effectuate the statute's remedial purpose, this Court is confident that it would do the same here and recognize the lost time value of money as an ascertainable loss for purposes of the MCPA.

Second, this conclusion is further bolstered by the fact that Montana

recognizes that "moratory interest" as compensation for the loss of use or detention of money is an independent element of damages. *Billings Clinic v. Peat Marwick Main & Co.*, 797 P.2d 899, 915 (Mont. 1990); *Martel Const., Inc. v. State*, 817 P.2d 677, 680-81 (Mont. 1991). Where a plaintiff alleges that, because of the defendant's wrongful conduct, she "lost the opportunity to use . . . funds for other purposes, to increase cash flow, or to invest," she may plead damages in the form of moratory interest. *Billings Clinic*, 797 P.2d at 915. The Montana Supreme Court explained that "'moratory interest' is not actual expense incurred, but rather is the additional compensation allowed for the loss of use of money." *Billings Clinic*, 797 P.2d at 915. When that amount is reasonably certain and capable of reasonable calculation, it is a cognizable item of damages. *Billings Clinic*, 797 P.2d at 915. It stands to reason that the Montana Supreme Court, having recognized that damages for the loss of use of money are recoverable, would construe the MCPA to effectuate its remedial purpose and conclude that the loss of use of money is sufficient to establish an "ascertainable loss."

Here, Hill has sufficiently demonstrated that she suffered an "ascertainable loss" for purposes of establishing standing under the MCPA. Between November 2016 and April 2017, LLR incorrectly charged Hill a total of $291.70 in sales tax on her various purchases and temporarily deprived her of the use of that money. As

part of its sales tax refund program, LLR issued refunds totaling $291.70 to Hill's credit cards between March 2017 and April 2017. (Doc. 21, at 12). While LLR thus refunded the total amount of overcharged sales tax, it did not pay unearned interest on that amount or otherwise compensate Hill for the loss of use of her money. By LLR's calculations, assuming it retained the $291.70 in sales tax for three months and the applicable interest rate is 10%, Hill has lost only $7.29 in unpaid interest. (Doc. 42, at 9 n. 6). While that amount is admittedly small, the MCPA authorizes claims for "any ascertainable loss of money or property." Mont. Code. Ann. § 3-14-133(1).

Finally, the authorities LLR relies on to buttress its contention that Hill has not suffered an ascertainable loss under the MCPA because she received a full refund are distinguishable and unpersuasive. The only Montana case LLR cites to for this proposition is *Anderson v. ReconTrust Co. N.A.*, 407 P.3d 692, 700 (Mont. 2017). Following foreclosure, the *Anderson* plaintiffs sued their bank, among other entities, for denying them a loan modification after telling them they preliminarily qualified. *Anderson,* 407 P.3d at 695. The plaintiffs' MCPA claim ultimately failed, not because they received a full refund for their economic loss, but because their claims "boil[ed] down to no more than that [their bank] erroneously told them that they qualified for a loan modification and then, within a matter of days,

backtracked and told them they did not." *Anderson*, 407 P.3d at 699.

LLR also relies on *Hamilton v. General Mills, Inc.*, 2016 WL 4060310 (D. Or. July 27, 2016) for the proposition that a plaintiff cannot establish an ascertainable loss to confer standing where she has received a full refund for her economic loss. In *Hamilton*, the plaintiff brought suit under Oregon's UTPA, which similarly requires "an ascertainable loss of money or property." *Hamilton*, 2016 WL 4060310, at *4 (citing ORS § 646.368(1)). The defendant in *Hamilton* issued a voluntary recall and refund program after a manufacturing accident in which gluten-free boxes of its cereal were contaminated with wheat flour. *Hamilton*, 2016 WL 4060310, at *1. The plaintiff's "entire claim for statutory damages [rested] on a $15.98 purchase that General Mills . . . offered to refund." *Hamilton*, 2016 WL 4060310, at *5. Unlike cases where plaintiffs successfully established standing by alleging "objectively verifiable economic losses that exceeded the recall/refund program of the defendant," the *Hamilton* plaintiff did not allege any other concrete and particularized injury apart from the refundable purchase price. *Hamilton,* 2016 WL 4060310, at *5. Because the plaintiff's loss of $15.98 was mooted by the refund program and he had not alleged any other concrete and particularized injury, the court concluded he did not have standing to sue under the Oregon UTPA. *Hamilton*, 2016 WL 4060310, at *5.

Notably, however, the *Hamilton* court did not specifically discuss whether the lost time value of money constitutes an ascertainable loss. Unlike the plaintiff in Hamilton, Hill alleges ascertainable loss beyond the amount of the refund based on the temporary deprivation of money and the fact that she has not been compensated for the lost time value of that money. Furthermore, in two other cases arising from the same manufacturing accident at issue in *Hamilton*, the court reached the opposite result and concluded the plaintiffs had standing because they sought damages beyond a mere refund. *Haddix v. General Mills, Inc.*, 2016 WL 2901589, at *6 (E.D. Cal. May 17, 2016); *Lengen v. General Mills, Inc.*, 185 F.Supp.3d 1213, 1221 (E.D. Cal. 2016).

For the reasons outlined above, the Court concludes that Hill has sufficiently demonstrated an ascertainable loss – namely, the loss of use of money and the lost time value of that money – as required for standing under the MCPA.

## B.      Deceit and Conversion

In addition to her MCPA claim, Hill brings state law claims against LLR for conversion and deceit. LLR argues Hill lacks standing to bring those claims for the same reason she lacks standing to maintain her MCPA claim – because she has not alleged any damages beyond the overcharged sales tax, which has been refunded. LLR takes the position that interest alone cannot constitute the damages necessary

16

to maintain claims for conversion and deceit.

But the Montana legislature has categorized damages for deceit broadly, making one who engages in deceit "liable for *any damage* that the person suffers." Mont. Code Ann. § 27-1-712 (emphasis added). For the same reasons that Hill has sufficiently demonstrated "any ascertainable loss" under the MCPA, she has sufficiently demonstrated "any damage" for purposes establishing standing to maintain a claim for deceit.

Contrary to LLR's argument regarding conversion, the damages for a conversion claim include "the value of the property at the time of conversion with the interest from that time…" Mont. Code Ann. § 27-1-320(1). While LLR refunded the full amount of sales tax it incorrectly collected from Hill, it did not pay interest. Thus, Hill has sufficiently alleged damages for purposes of establishing standing to maintain a claim for conversion.

LLR further argues Hill lacks standing to maintain her conversion claim because she did not demand that her money be returned, and so cannot show that LLR exercised unauthorized control over the allegedly converted property. (Doc. 20, at 29-30). But there is longstanding contrary authority holding that a demand for possession of the allegedly converted property "is not necessary as a condition precedent to the right to maintain the action." *Ducket v. Biggs*, 188 P. 938, 940

(Mont. 1920). More recently, the Montana Supreme Court explained that "[w]here the original taker acquires possession of the property rightfully, a demand and refusal are ordinarily necessary to give rise to a cause of action in conversion." *Foster v. First Nat. Bank of* Missoula, 365 P.2d 938, 941 (Mont. 1961). But "[w]here the initial taking is wrongful, or where there is an independent act of conversion through . . . exercise of dominion inconsistent with the rights of plaintiff . . . a demand is not necessary." *Foster*, 365 P.2d at 941.

Thus, although a showing that the plaintiff demanded the return of the allegedly converted property may be one way of establishing unauthorized control by the defendant, it is not a prerequisite where, as here, the initial taking was improper. LLR cites *Feller v. First Interstate Bancsystem, Inc.*, 299 P.3d 338, 343 (Mont. 2013), for the proposition that a plaintiff must show that she asked for the return of her property in order to establish that the defendant had "unauthorized control." But unlike here, there is no indication that the initial taking of the escrow funds at issue in *Feller* was improper.

For the reasons discussed above, the Court concludes that Hill has standing to maintain her state law claims for deceit and conversion.

## C.    Article III Standing

Even assuming Hill has standing under Montana law to pursue her state law

18

claims, she must have standing that satisfies Article III so that this Court can exercise subject matter jurisdiction. See *Lee v. Amer. Nat'l Ins. Co.*, 260 F.3d 997, 1001-02 (9th Cir. 2001) ("[A] plaintiff whose cause of action is perfectly viable under state law may nonetheless be foreclosed from litigating the same cause of action in federal court if he cannot demonstrate the requisite injury.").

LLR's Article III standing argument mirrors its state law standing argument. It contends that because Hill received a full refund of all overcharged sales tax before she filed suit, she cannot establish the requisite concrete and particularized injury in fact. For support, LLR relies primarily on three cases for the general proposition that a plaintiff who receives a pre-litigation refund has not suffered an injury in fact and lacks Article III standing.[1] See *Hamilton*, 2016 WL 406031, at **4-5; *Stanford v. Home Depot U.S.A., Inc.*, 2008 WL 7348181, at *8 (S.D. Cal. May 27, 2008); *Epstein v. JPMorgan Chase & Co.*, 2014 WL 1133567, at *8 (S.D.N.Y. Mar. 21, 2014).

But *Hamilton* is not persuasive for the reasons set forth above, and *Epstein* and *Stanford* are both distinguishable. In *Epstein*, the court recognized that plaintiff

---

[1] In a footnote, LLR string cites several additional cases for the same proposition. (Doc. 20, at 24 n. 6). The Court finds those cases are distinguishable either because the defendant provided plaintiff a full refund with interest, they involved restitution, or there was no underlying determination by the Court that the plaintiff had satisfied the prerequisites for standing under state law.

"could seek to premise standing on a damages theory that he was deprived of the opportunity to use and/or earn interest on the 67 cents for the seven-week period that it was ostensibly 'converted' by Defendants[,]" but had not made such a claim. *Epstein,* 2014 WL 1133567, at \*7 n.6. And in *Stanford*, the plaintiff was overcharged $19.00 and returned to the store the next day seeking only a refund, which he received that day. *Stanford*, 2008 WL 7348181, at \*8 & n.9.

Instead, the Court is persuaded by *Weidenhamer v. Expedia, Inc.*, 2015 WL 1292978 (W.D. Wash. March 23, 2015), which Hill relies on to support her argument that she has sufficiently established an Article III injury. The plaintiff in *Weidenhamer* alleged damages based on the defendant's failure to provide a promised 5% discount on an airfare purchase. *Weidenhamer*, 2015 WL 1292978, at \*1. Before the plaintiff filed suit, the defendant refunded $76.66 – an amount equal to the promised 5% discount -- directly to the plaintiff's credit cards. *Weidenhamer*, 2015 WL 1292978, at \*2. The defendant moved to dismiss, arguing the plaintiff lacked standing under Article III because of the refund. *Weidenhamer*, 2015 WL 1292978, at \*2.

After finding that the temporary deprivation of money constituted an injury under Washington's Consumer Protection Act, the Court concluded "that Article III also recognizes temporary deprivations of money as injuries." *Weidenhamer*,

2015 WL 1292978, at **3-4. The court explained that "[a] 'full' refund is not 'full' compensation unless it comes with compensation for the lost time value of the money," no matter how small, and concluded the plaintiff had standing based on a two-month deprivation of his $80, which the court calculated to be $1.33 at 10% interests or just 13 cents at 1% interest. *Weidenhamer*, 2015 WL 1292978, at *4. The court acknowledge that was "very little to be sure," but absent any "appellate authority excluding tiny monetary injures from the scope of Article III" it declined "to read a dollar limit into Article III."

Here, as in *Weidenhamer*, the temporary deprivation of money by defendant, combined with the lost time value of that money, constitutes a cognizable Article III injury. While the lost time value of the $291.70 LLR retained may have been as little as $7.29, the Court concludes that is enough to confer Article III standing.

In an attempt to bolster its argument to the contrary, LLR has filed a notice of supplemental authority calling the Court's attention to the federal district court's recent decision in *Katie Van v. LLR, Inc.*, 2019 WL 1005181 (D. Alaska March 1, 2019). Like Hill, the plaintiff in *Van* filed suit against LLR after the *Webster* class action was dismissed. The facts in *Van* are nearly identical to those presented here, and like Hill, the plaintiff asserted claims for conversion and violations of the forum state's Unfair Trade Practices and Consumer Protection Act.

21

The court granted LLR's motion to dismiss, concluding that the plaintiff's alleged loss of $3.76 in interest was too small of a monetary loss to constitute an "injury in fact" necessary to confer Article III standing. *Van*, 2019 WL 1005181, at *6. LLR argues that the court's holding in *Van* validates its argument that interest alone does not confer Article III standing.

While *Van* is factually analogous, this Court is not persuaded by the *Van* court's reasoning. *Van* acknowledged that under *Czyzewski v. Jevick Holding Corp.*, 237 S.Ct. 973, 983 (2017), "a loss of even a small amount of money is ordinarily an 'injury,'" but relied on *Ingraham v. Wright*, 430 U.S. 651, 674 (1977) for the proposition that "[t]here is, of course, a de minimis level of imposition with which the Constitution is not concerned." *Van* then cited *Skaff v. Meridian N Am. Beverly Hills, LLC*, 506 F.3d 832, 840 (9th Cir. 2007) for the principle that some injuries are "too trifling of an injury to support constitutional standing," and concluded that Plaintiff's alleged loss of interest was such an injury. *Van*, 2019 WL 1005181, at *6.

But the injuries alleged in S*kaff* and *Ingraham* were materially distinguishable from the monetary injury alleged here. In *Skaff,* a paraplegic hotel guest alleged he was injured when the hotel mistakenly assigned him a room with a bathtub rather than a roll-in shower and did not provide him a shower chair. But

because the hotel immediately corrected both mistakes, the Ninth Circuit noted that "law cares not about trifles" and concluded the plaintiff had not suffered a cognizable injury. *Skaff*, 506 F.3d at 839-40. In *Ingraham¸* middle school students brought a civil rights action alleging they had been subjected to disciplinary corporal punishment in violation of their constitutional rights. The United States Supreme Court recognized that "the state cannot hold and physically punish an individual except in accordance with due process of law," and held that Fourteenth Amendment liberty interests are implicated where school authorities "deliberately decide to punish a child for misconduct by restraining the child and inflicting appreciable pain." *Ingraham*, 430 U.S. at 674. In reaching this holding, the Supreme Court acknowledged that "[t]here is, of course a de minimis level of imposition with which the Constitution is not concerned." *Ingraham*, 430 U.S. at 674. *Van* essentially takes this acknowledgement out of context and applies it unconvincingly to hold that the monetary injury alleged by plaintiff, consisting of $3.76 in lost interest, was not a cognizable injury in fact for purposes of Article III standing.

This Court finds the rule set forth in *Czyzewski,* that "[f]or standing purposes, a loss of even a small amount of money is ordinarily an 'injury'," is directly applicable here. *Czyzewski*, 237 S.Ct. at 983. *Czyzewski* derived this

principle from *McGowan v. Maryland*, 366 U.S. 420, 430-431 (1961), which found that appellants fined just $5 plus costs had standing.

*Czyzewski* supports the Court's conclusion here, that Hill's alleged loss of interest, which may have been as little as $7.29, is a cognizable injury in fact for purposes of standing. Accordingly, and for the reasons set forth above, the Court concludes that Hill has standing under both Article III and Montana law to maintain her state law claims.

### D.    Injunctive Relief

In her prayer for relief, Hill asks for an order declaring LLR's "conduct unlawful and enjoining the conduct herein." (Doc. 1, at 30). For a plaintiff to have standing to pursue injunctive relief, she must demonstrate the threat of imminent injury. *Clapper v. Amnesty Int'l USA*, 133 S.Ct. 1138, 1148 (2013). To meet this standard, a plaintiff must demonstrate that she is "realistically threatened by a repetition of the violation." *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006).

LLR argues Hill does not have Article III standing to maintain her request for injunctive relief because she has not shown "a sufficient likelihood that [s]he will again be wronged in a similar way." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). LLR has submitted evidence showing that the Audrey point of sale system pursuant to which some customers were overcharged sales tax was disabled

24

in May 2017 and replaced with Bless. (Doc. 21, at ¶ 20). The record reflects that Hill's last purchase in Audrey was in April 2017, and after that purchased LLR clothing from Retailers using Bless, for which she was not charged any sales tax. (Doc. 21, ¶ 29).

Hill has not shown that there is any realistic threat that she will be overcharged sales tax in the future. Hill agrees that if LLR has in fact "discontinued its misconduct," then she "does not seek an injunction with respect to LuLaRoe's legacy POS system." (Doc. 36, at 11 n. 1). To the extent Hill asks for an order declaring LLR's "conduct unlawful and enjoining the conduct herein," she lacks standing because she has not shown there is a sufficient likelihood that she will again be wronged in a similar way.

Hill explains that she does, however, "seek, for herself and the class, an accounting, which request is in the nature of equitable relief." (Doc. 36, at 11 n. 1). Whether she is entitled to an accounting is beyond the scope of the pending motion.

## IV.   <u>Motion to Dismiss for Failure to State a Claim</u>

Having determined that Hill has standing to pursue her claims for violations of the MCPA, deceit, and conversion, the Court turns next to LLR's motion to dismiss those claims under Rule 12(b)(6).

**A**.     **MCPA Claim**

LLR argues Hill's MCPA claim should be dismissed because class actions are expressly prohibited under the MCPA. See Mont. Code Ann. § 30-14-133(1) (providing for "an individual but not a class action"). The MCPA's ban on class actions is in apparent conflict with Federal Rule of Civil Procedure 23, which permits class actions that meet certain procedural requirements. LLR contends that allowing Hill to maintain this class action would enlarge her state-created rights under the MCPA, thereby violating the Rules Enabling Act, 20 U.S.C. § 2702.

In *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), the United States Supreme Court addressed the conflict between Rule 23 and a state statute prohibiting class actions. The Supreme Court held that Rule 23 preempted the application of a New York statute prohibiting class actions in cases seeking penalties or statutory minimum damages. *Shady Grove*, 559 U.S. at 398-407. The *Shady Grove* decision consisted of a four-justice plurality, a concurrence by Justice Stevens, and a four-justice dissent.

*Shady Grove* established a two-step analysis for determining whether a federal rule of procedure or state law controls in a diversity case. First, the court considers "whether the federal and state rules can be reconciled." *Shady Grove*, 559 U.S. at 410. If they cannot, the court moves to the second step and determines

26

whether application of Rule 23 would violate the Rules Enabling Act, 28 U.S.C. § 2072, which prohibits application of a federal rule where doing so would "abridge, enlarge or modify" any state substantive right. *Shady Grove*, 559 U.S. at 398.

The *Shady Grove* Court split on what exactly the second step involves, however, with the plurality stating that it requires examining the federal rule itself to determine whether it "really regulate[s] procedure." *Shady Grove*, 559 U.S. at 407. Justice Stevens viewed it differently in his concurring opinion, however, and concluded the proper inquiry is whether the federal rule "would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right." *Shady Grove*, 559 U.S. at 423.

When, as in *Shady Grove*, "no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those [Justices] who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977). Many courts interpreting *Shady Grove* have concluded that Justice Stevens's concurrence controls because it provides the narrowest grounds for the holding. See e.g. *Greene v. Gerber Prods. Co.*, 262 F.Supp.3d 38, 68 (E.D.N.Y. 2017) (collecting cases); *Davidson v. Apple, Inc.*, 2018 WL 2325426, at *10 (May 8, 2018); *In re Effexor*

27

*Antitrust Litigation*, 2018 WL 4466050, at *13 (D.N.J. Sept. 18, 2018).

Other courts, have declined to find the concurrence in *Shady Grove* controlling. See e.g. *Wittman v. CB1, Inc.,* 2016 WL 3093427, at *5 (D. Mont. June 1, 2016) (collecting cases). Instead, those courts have looked only to the part of the plurality opinion that was joined by five Justices, along with the pre-*Shady Grove* approach, to determine whether application of a federal rule violates the Rules Enabling Act. *Wittman,* 2016 WL 393427, at *6.

LLR argues this Court should follow the first line of cases and treat Justice Stevens's concurrence as the controlling opinion. Assuming the two-step analysis set forth in the concurring opinion applies, LLR maintains the class action ban at issue here is enforceable because it is so integral to the MCPA that it functions to define the scope of the rights and remedies created thereunder.

As LLR recognizes, however, presiding United States District Judge Brian Morris rejected this argument in *Wittman.* Noting that the Ninth Circuit had yet to address the issue, Judge Morris declined to follow the concurrence in *Shady Grove* as the controlling approach. *Wittman*, 2016 WL 3093427, at *5. Instead, he looked only to the part of the plurality opinion which five Justices joined, and the pre-*Shady Grove* approach in the Ninth Circuit, to determine whether application of Rule 23 violated the Rules Enabling Act by abridging, enlarging, or modifying

substantive rights under the MCPA. *Wittman*, 2016 WL 3093427, at *6. Under that approach, Judge Morris concluded "that the MCPA class action prohibition remains procedural in nature and that Rule 23 applies to determine whether a claim may be brought as a class action" in a federal diversity case. *Wittman*, 2016 WL 3093427, at *6.

LLR asks the Court to depart from the holding in *Wittman* based on more recent cases in the Ninth Circuit and elsewhere following the *Shady Grove* concurrence as the controlling opinion. See e.g. *Greene*, 262 F.Supp.3d at 68; *Davidson*, 2018 WL 2325426, at *10; *In re Effexor Antitrust Litigation*, 2018 WL 4466050, at *13. The Court has reviewed these cases but is not persuaded that they warrant departing from Judge Morris's well-reasoned decision in *Wittman*. The Ninth Circuit still has not directly addressed whether the *Shady Grove* plurality or concurrence controls on this point, and *Wittman* remains good law. *Wittman* is thus dispositive of LLR's argument, and the MCPA's class action ban does not apply.

LLR next argues that Hill fails to state a claim under the MCPA because she cannot show that she suffered an ascertainable loss. As discussed above with respect to LLR's motion to dismiss for lack of subject matter jurisdiction, however, Hill has sufficiently established that she suffered an ascertainable loss under the MCPA.

LLR further maintains that Hill's MCPA claim sounds in fraud and should be dismissed because it does not satisfy Rule 9(b)'s heightened pleading standard. Rule 9(b) requires that a party alleging fraud "state with particularity the circumstances constituting fraud[.]" This means that the "plaintiff must allege 'the who, what, when, where, and how of the misconduct charged,' including what is false or misleading about a statement, and why it is false." *United States v. Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016).

The Complaint alleges that LLR violated the MCPA by collecting an unlawful sales tax, failing to disclose that it was not authorized to collect such taxes, and actively misrepresenting to its customers that the 2016 Tax Policy and the collection of sales tax was proper. (Doc. 1, ¶ 105). The Complaint further alleges that Hill suffered ascertainable loss as a result of LLR's MCPA violations, which flowed directly from LLR's fraud in its scheme to systematically overcharge customers, and that Hill justifiably relied on LLR's knowingly false representations that the surcharge was a proper sales tax and, therefore, paid the invoices generated by Audrey. (Doc. 1, ¶ 106-07).

Hill disputes whether Rule 9(b) applies, but contends that even if it does, she has satisfied the heightened pleading standards. Assuming Rule 9(b) applies, the Court agrees that the allegations set forth above are "specific enough to give

defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG* LLP, 476 F.3d 756, 764 (9th Cir. 2007). Because Hill has stated a claim for relief, LLR's motion to dismiss her MCPA claim should be denied.

### B.   Deceit

LLR similarly moves to dismiss Hill's deceit claim for failure to meet Rule 9(b)'s heightened pleading standard. See *Pfau v. Mortenson*, 858 F.Supp.2d 1150, 1158 (D. Mont. 2012) (Rule 9(b)'s pleading standard applies to a claim for deceit).

Under Mont. Code Ann. § 27-1-712(1), "[o]ne who willfully deceives another with intent to induce that person to alter the person's position to the person's injury or risk is liable for any damage that the person suffers." Deceit includes "the suggestion as a fact of that which is not true by one who does not believe it to be true," "the assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true," or "the suppression of a fact by one who is bound to disclose it or who gives information of other facts that are likely to mislead for want of communication of that fact." Mont. Code Ann. § 27-1-712(2).

Contrary to LLR's argument, the body of the Complaint provides enough

detail to satisfy Rule 9(b). For example, the Complaint alleges that: LLR provided Hill with an invoice every time she made a purchase; each of those invoices represented that LLR was collecting a sales tax on the purchase; and Hill paid each invoice that implicitly represented she was paying a proper sales tax when, in fact, no such tax was owed by Hill – a fact readily known by LLR. (Doc. 1, ¶¶ 58-60). These allegations are specific enough to give LLR notice of the particular misconduct which is alleged to constitute deceit, thereby satisfying Rule 9(b).

To the extent LLR further maintains Hill has not stated a claim for deceit because she cannot establish damages, this argument fails for the reasons discussed above. See supra, at 16-17.

### C.    Conversion

LLR argues Hill fails to state a claim for conversion for two reasons. First, LLR maintains that to show it had "unauthorized" control over her money as required to maintain a claim for conversion, Hill must allege that she demanded the return of the money allegedly converted. As discussed above, however, a demand for possession of the allegedly converted property "is not necessary as a condition precedent to the right to maintain the action." *Ducket*, 188 P. at 940. See supra at 17-18. Second, LLR argues Hill has not alleged the damages necessary to maintain a claim for conversion. This argument also fails for reasons discussed above. See

32

supra at 16.

## V.   <u>Motion to Strike Class Allegations</u>

LLR asks the Court to strike Hill's class allegations on the ground that the Complaint cannot meet Rule 23's superiority requirement due to LLR's refund program.

A plaintiff seeking certification of a class action bears the burden of satisfying the requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy of representation—as well as Rule 23(b)(3)'s requirements of predominance and superiority. To satisfy the superiority requirement, a plaintiff must demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

LLR argues Hill cannot satisfy Rule 23's superiority requirement in light  of its comprehensive refund program. LLR cites several cases for the proposition that a defendant-administered refund program is superior to a class action. See e.g. *In re ConAgra Peanut Butter Products Liability* Litigation, 251 F.R.D. 689, 699 (N.D. Ga. 2008) (concluding superiority requirement not met where the defendant offered full refunds to all purchasers of recalled peanut butter); *Pagan v. Abbott Labs.*, 287 F.R.D 139, 151 (E.D.N.Y. 2012) (no superiority where defendant recalled contaminated infant powder formula and refunds were readily available);

*In re Phenylpropanolamine (PPA) Products Liability Litigation*, 214 F.R.D. 614, 622 (W.D. Wash. 2003) (superiority requirement not satisfied where defendants offered refund and replacement programs). Some of these courts have reasoned that it makes "little sense to certify a class where a class mechanism is unnecessary to afford the class members redress," *In re ConAgra*, 251 F.R.D. at 700; *In re PPA*, 214 F.R.D. at 622.

Hill's argument in response is twofold. First, she contends that LLR's refund program is not another method of "adjudicating the controversy" under the plain language of Rule 23. Second, Hill argues LLR's refund program is not superior because the class action complaint seeks statutory damages in excess of those refunds.

Notwithstanding the cases cited by LLR, whether a refund program may properly be considered as an "other available method[]" of "adjudicating the controversy" for purposes of assessing superiority under Rule 23 is not entirely settled. See e.g. *Martin v. Monsanto Co.*, 2017 WL 1115167, at *9 (C.D. Cal. March 24, 2017) ("Pursuant to the plain language of Fed. R. Civ. P. 23(b)(3), the analysis is whether the class action format is superior to other methods of adjudication, not whether a class action is superior to an out-of-court, private settlement program."); *Forcellati v. Hyland's Inc.*, 2014 WL 1410264 , at *12

34

(C.D. Cal. Apr. 9, 2014) (noting that Rule 23 directs the court to consider other available methods of "adjudication" and finding that defendant's refund did not defeat superiority).

But even assuming a non-litigation alternative may be considered when assessing the superiority of a class action, the Court finds that under the circumstances, LLR's refund program does not defeat superiority. Hill's class action Complaint seeks statutory damages in excess of the refunds provided by LLR. (Doc. 1, ¶ 111). Where, as here, a class action complaint seeks damages in excess of those provided as part of a defendant-administered refund program, superiority is not defeated. See e.g. *Kurtz v. Kimberly-Clark Corp.*, 321 F.r.d 482, 553 (E.D.N.Y. 2017 ("The remedy available for plaintiffs in a class action – statutory damages of $50 or $500 per purchase – is a more effective remedy for most class members than a simple refund of their purchase price."); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 415 (S.D.N.Y. 2015).

The cases LLR relies on for the proposition that a refund program is superior to a class action are distinguishable either because the plaintiffs did not make a claim for statutory damages, or the court did not discuss statutory damages when assessing superiority. Because the Complaint in this case seeks statutory damages, the Court finds that LLR's refund program does not defeat superiority, and LLR's

motion to strike the Complaints' class allegations on this basis should be denied.

## VI.   <u>Conclusion</u>

For the reasons set forth above,

IT IS RECOMMENDED that

(1) LLR's motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) be granted with respect to Hill's claim for injunctive relief, but denied as to her claims for violations of the MCPA, conversion and deceit;

(2) LLR's motion to dismiss for failure to state a claim be denied; and

(3) LLR's motion to strike class allegations be denied.

DATED this 8th day of March, 2019.

Jeremiah C. Lynch
United States Magistrate Judge